UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JANE DOE,<br><br>   Plaintiff,<br><br>v.<br><br>LONESTAR IT SOLUTIONS, LLC; and TRANSUNION RENTAL SCREENING SOLUTIONS, INC.,<br><br>   Defendants. | Case No.: 6:23-cv-00575<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Jane Doe ("Plaintiff") by and through her counsel brings the following Complaint against Lonestar IT Solutions, LLC ("Lonestar"), and Transunion Rental Screening Solutions, Inc. ("TURSS") (Lonestar and TURSS together the "Defendants" and individually a "Defendant") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681, *et seq.*, arising out of tenant screening reports that Lonestar and TURSS published to Plaintiff's potential landlord, which **falsely** portrayed Plaintiff had been convicted of "battery domestic violence", "possession of cocaine" and "use or possession of drug paraphernalia".

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C.

§1681, *et seq.* ("FCRA").

2.      Lonestar and TURSS are consumer reporting agencies ("CRAs") that compile and maintain files on consumers on a nationwide basis. Defendants sell consumer reports, also known as tenant screening reports, generated from their database and furnish these tenant screening reports to mortgage brokers, landlords, and property management companies who use the reports to make decisions regarding prospective borrowers and tenants.

3.      Defendants assembled, evaluated and published an inaccurate tenant screening reports to Plaintiff's prospective landlord, which included recent convictions "battery domestic violence", "possession of cocaine" and "use or possession of drug paraphernalia" that did not belong to Plaintiff.

4.      Defendants' reports contain patently inaccurate information because a Court previously adjudged to seal the criminal records.

5.      Defendants' reports contain patently inaccurate information because Plaintiff was not adjudged guilty for those charges.

6.      Plaintiff's prospective landlord denied Plaintiff's housing application after receiving the tenant reports from Defendants, in which Defendants published the patently inaccurate criminal records.

7.      Defendants' inaccurate reporting could have easily been avoided had Defendants performed a cursory review of the widely available underlying public

court records pertaining to the criminal records prior to publishing the information to Plaintiff's prospective landlord.

8. Defendants do not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendants' failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendants committed these violations pursuant to their standard policies and practices, which harm innocent consumers seeking housing by prejudicing their prospective landlords with inaccurate information.

10. Defendants' inaccurate reports cost Plaintiff the ability to rent the property that was suitable for Plaintiff, her husband and her daughter's accommodation and finances, causing her monetary damages and physical injury as a result of emotional distress, embarrassment, inconvenience, anxiety, fear of homelessness, and financial loss.

11. As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; additional and unexpected expenses to secure emergency and temporary accommodations; loss of time and money trying to correct the tenant screening reports; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting

psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Defendants' conduct, action, and inaction, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. §1681e(b) *et seq*.

## PARTIES

13. Plaintiff is a natural person residing in Winter Springs, Florida, and is a "consumer" as that term is defined in §1681a(c).

14. Plaintiff has a privacy right so substantial as to outweigh the customary and constitutionally-embedded presumption of openness in judicial proceedings.

15. The criminal records that underlie this action were sealed by court order on or about July 21, 2022, pursuant to §943.059, Fla. Stat. As a condition to sealing the records, the court previously found that Plaintiff had not been found guilty.

16. Use of Plaintiff's actual name would nullify the protections afforded Plaintiff under Florida law. The criminal records that underlie this action involve information of the utmost intimacy of Plaintiff.

17. Defendant Lonestar IT Solutions, LLC (Lonestar") is a Texas LLC doing business throughout the United States, including in this District.

18. Lonestar can be served through its registered agent Erik Dail, at the registered office located at 5402 Bowser Ave., Dallas, TX 75209.

19. Defendant Transunion Rental Screening Solutions, Inc. ("TURSS") is a Delaware corporation doing business throughout the United States, including in this District.

20. TURSS can be served through its registered agent Corporation Service Company, located at 251 Little Falls Drive, Wilmington, DE 19808.

21. Among other things, Defendants sell consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

22. Defendants are consumer reporting agencies as defined in 15 U.S.C. §1681a(f) because for monetary fees, they regularly engage in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and use interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 and 15 U.S.C. §1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

24. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

25. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

26. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. §1681.

27. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. §1681e(b).

28. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR HOUSING APPLICANTS

*Doe v. LoneStar IT Solutions, LLC & Transunion Rental Screening Solutions, Inc.*
Complaint

29. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the one Defendant prepared in Plaintiff's name.

30. The FCRA provides a number of protections for housing applicants who are the subject of tenant screening reports for the purpose of securing housing and credit.

31. In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like Defendant, are "consumer reporting agencies." §§1681a(d) and (f).

32. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." §1681.

33. Under §1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

34. Defendant disregarded its duties under the FCRA with respect to Plaintiff's tenant screening report.

### DEFENDANTS' ILLEGAL BUSINESS PRACTICES

35. Over the past 15 years, there has been increased collection and

aggregation of consumer data, including eviction and civil judgment records. As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

36. Tenant Screening Reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating tenant screening reports.

37. Tenant Screening companies, like Defendant, collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

38. Given that Defendant is in the business of selling tenant screening reports, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

39. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being

provided to Defendant's customers.

40. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

41. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

42. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting information belonging to another consumer.

43. As a provider of tenant screening reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff Applies for Rental

44. Plaintiff has custody of her daughter and receives a mere $1,000 a month in child support from the father of her daughter.

45. In or around January 2023, Plaintiff became embroiled in a bitter custody battle for her daughter.

46. Thereafter, Plaintiff began searching for a new rental in Winter Springs, for herself, her husband and her daughter.

47. Plaintiff's search was limited not only because of the location of their future home but also because Plaintiff was careful to make sure she could afford the rent and build an emergency fund.

48. Plaintiff was also searching for an apartment that was in a safe neighborhood and clean to protect her daughter.

49. In or around early March 2023, Plaintiff toured a home that met her criteria and budget and almost immediately began the application process.

50. As part of her application, Plaintiff was required to consent to a tenant screening report.

51. Plaintiff was also required to pay for the tenant screening report herself.

## Defendant Publishes an Inaccurate Tenant Screening Report to the Property Manager

52. The Property Manager contracted with Lonestar to conduct tenant screening reports on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

53. On or about March 5, 2023, Defendants sold a tenant screening report about Plaintiff to the Property Manager, wherein Defendants published information including a compilation of Plaintiff's credit history, criminal history, and civil

records history.

54. The tenant screening reports are consumer reports regulated by the FCRA.

55. Within those tenant screening reports, Defendants published inaccurate information about Plaintiff.

56. Specifically, Defendants reported inaccurately that Plaintiff had been convicted of "battery domestic violence", "possession of cocaine" and "use or possession of drug paraphernalia", as recently as May 2020.

57. The information is patently inaccurate because a Court had previously adjudged to seal the criminal records.

58. The information is patently inaccurate because Plaintiff was never convicted for those charges.

59. The above-referenced information should not have been included in any tenant screening report about Plaintiff.

60. Specifically, it is indisputable that prior to furnishing the reports about Plaintiff to the Property Manager, Defendants failed to consult widely available public court records on-line for Brevard County, which indicate that Plaintiff has no criminal records.

61. Defendants' unreasonable or non-existent procedures allowed Defendants to publish a report about Plaintiff wherein Defendants reported

stigmatizing information in violation of Florida law.

62. Had Defendants actually consulted or obtained the widely available underlying public court records, they would have seen Plaintiff has no criminal record.

63. Plaintiff was never convicted of any of the crimes that Defendants were reporting.

64. On or about July 21, 2022, a Florida Court found that Plaintiff was not found guilty and ordered that all records be sealed.

65. Between July 21, 2022 and March 5, 2023, Defendants failed to update their records.

66. Upon information and belief, Defendants have no policies and procedures to avoid reporting charges as convictions, when no conviction has been entered.

67. Upon information and belief, Defendants have no policies and procedures to timely update their records on cases where criminal charges are filed but before there is a conviction.

68. Upon information and belief, Defendants have no policies and procedures to timely update their records on cases where no conviction has been entered and an order sealing or expunging the record has been entered.

69. Upon information and belief, Defendants have no policies and

procedures to timely update their records on cases where no conviction has been entered and thereafter the case no longer appears on the court's records.

70. The sole reason the inaccurate criminal records were reported was that Defendants failed to follow reasonable procedures to assure the maximum possible accuracy of the information they published within the tenant screening reports they sold about Plaintiff to Plaintiff's prospective landlord.

71. Had Defendants followed reasonable procedures, they would have discovered that the inaccurate, stigmatizing criminal charges had never become convictions and, even worse, the court had ordered the records sealed because they case was no longer available on any database.

72. In preparing and selling consumer reports about Plaintiff, wherein Defendants published to Plaintiff's prospective landlord inaccurate information about Plaintiff, Defendants failed to follow reasonable procedures to assure that the reports were as accurate as maximally possible, in violation of §1681e(b).

## Plaintiff's Application is Denied

73. On or about March 7, 2023, Plaintiff was notified by the Property Manager that they found concerning issues, expressly referencing the domestic violence conviction.

74. On or about March 8, 2023, the Property Manager communicated to Plaintiff that they were rejecting her application.

75. On or about March 8, 2023, Plaintiff obtained a copy of a tenant screening report and was shocked and humiliated upon reviewing and realizing that the criminal records were inaccurately published in the tenant screening report that Defendants sold about Plaintiff to the Property Manager.

76. Plaintiff pleaded with he Property Manager and pointed out that a court had found she had not been convicted of anything and ordered the records sealed.

77. Plaintiff also offered to include her husband on the lease, thereby guaranteeing that the Property Manager would be protected legally and financially.

78. Based on the Property Manager's emails, they had already formed an opinion of Plaintiff no matter the court order.

79. Plaintiff was very panicked, confused, embarrassed, annoyed, persecuted and concerned about the impact of the criminal records being reported as convictions on her tenant screening reports now and in the future.

80. Specifically, Defendants were reporting patently false information, and sold those reports to Plaintiff's prospective landlord. This exculpatory public record information was widely available to Defendants for over seven months, prior to publishing Plaintiff's tenant screening reports to the Property Manager, but Defendants failed to perform even a basic internet search.

**Plaintiff Disputed the Inaccurate Information in**

**Defendants' Tenant Screening Reports**

81. On or about March 8, 2023, desperate to secure housing with the Property Manager and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Lonestar and/or TURSS.

82. Plaintiff specifically asked them to remove the criminal records and attached a copy of the court order sealing the records.

83. On March 10, 2023, just two days after Plaintiff's dispute, TURSS confirmed that it had reinvestigated Plaintiff's dispute and removed the entire criminal record from Plaintiff's tenant screening report.

84. Plaintiff reasonably believes that due to Defendants' inaccurate reporting in the first instance, the Property Manager formed a negative opinion about Plaintiff and believed Defendants' reporting to be accurate.

85. Defendants' inaccurate reports cost Plaintiff the housing opportunity that best met her and her daughter's needs, including those attendant to affordability, safety, cleanliness, and proximity to work, school, friends, and family.

86. Due to Defendants' unreasonable procedures in the first place and despite Plaintiff's continued efforts to seek housing, Plaintiff has had to move into a hotel while she searches for another rental.

87. The hotel that Plaintiff is painstakingly able to afford is grossly

inconvenient as the hotel is located one-hour drive away from Plaintiff's daughter school and her daughter's father's residence. Therefore, Plaintiff has to spend an hour driving her daughter to school, and to the father's residence, each way. The drive not only adds considerable time and inconvenience, it also increases Plaintiff's expenses.

88. Plaintiff initially considered moving in with her father. However, her father is in treatment for stage IV lung cancer and thus cannot be exposed to other people living in the same house.

89. The injuries suffered by Plaintiff as a direct result of Defendants' erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendants' conduct would have given rise to causes of action based on defamation and invasion of privacy.

90. As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; additional and unexpected expenses to secure emergency and temporary accommodations; loss of time and money trying to correct the tenant screening reports; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

# CLAIMS FOR RELIEF

## COUNT I

## 15 U.S.C. §1681e(b)

## Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

91. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

92. Defendants are "consumer reporting agencies" as defined by §1681a(f).

93. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by §1681a(c).

94. At all times pertinent hereto, the above-mentioned tenant screening reports were "consumer reports" as that term is defined by §1681a(d).

95. Defendants violated §1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening reports they sold about Plaintiff as well as the information they published within the same.

96. As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; additional and unexpected expenses to secure emergency and temporary accommodations; loss of time and money trying to correct the tenant

*Doe v. LoneStar IT Solutions, LLC & Transunion Rental Screening Solutions, Inc.*
Complaint

screening reports; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

97. Defendants willfully violated §1681e(b) in that their conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. Alternatively, they were negligent, entitling Plaintiff to recover under §1681o.

98. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. §§1681n, 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendants negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate

and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: March 29, 2023

**CONSUMER ATTORNEYS**

*/s/ Santiago J Teran*
Santiago J Teran (FL Bar No. 1018985)
E-mail: steran@consumerattorneys.com
Consumer Attorneys
2125 Biscayne Bldv., Ste 206
Miami, FL 33137
Direct: (347) 946-7990
Facsimile: (718) 715-1750

Consumer Attorneys
8245 N. 85th Way
Scottsdale, AZ 85258

*Attorney for Plaintiff Doe*